# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 7570 | **DATE** | 5/21/2004 |
| **CASE TITLE** | Meyers vs. Trugreen, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the Memorandum Opinion and Order, defendants' motion for summary judgment [8-1] is denied. Status hearing is set for 6/17/04 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 3 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAY 2 4 2004 | 15 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | JXM | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 5/21/2004 | |
| MD | courtroom deputy's initials | | date mailed notice MD mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

DOCKETED
MAY 2 4 2004

MELINDA MEYERS,            )
                           )
    Plaintiff,             )
                           )
    vs.                    )   No. 03 C 7570
                           )   Judge Joan H. Lefkow
TRUGREEN, INC., d/b/a TRUGREEN )
CHEMLAWN, THE SERVICEMASTER )
COMPANY, JOHN T. GINLEY, KARL J. )
SCHERTZ, and ROBERT J. PHILLIPS, )
                           )
    Defendants.            )
                           )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Melinda M. Meyers ("Meyers"), brings this sexual harassment law suit against TruGreen Limited Partnership ("TruGreen"), John T. Ginley ("Ginley"), Karl J. Schertz ("Schertz"), and Robert J. Phillips ("Phillips") (collectively "defendants"), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-1 *et seq.* Her Complaint also contains an Illinois common law claim for intentional infliction of emotional distress, over which this court has jurisdiction pursuant to 28 U.S.C. § 1367. Before the court is defendants' motion for summary judgment. For the reasons set forth below, the motion is denied.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To determine whether any genuine issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are



part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF[1]

Meyers began her employment with TruGreen as a sales associate in the company's West Chicago branch in December 2002. (Def. L.R. 56.1 ¶ 1.) All three individual defendants, Ginley, Schertz, and Phillips, are managers employed by TruGreen. (Def. L.R. 56.1 ¶ 4.) Ginley was Meyers' immediate supervisor, Schertz is a branch manager, and Phillips is the human resources manager for TruGreen. (Compl. ¶ 13; Def. L.R. 56.1 ¶ 5.)

Meyers alleges that during her employment Ginley flirted with her, made unwanted sexual advances and inappropriately touched her from January to April 2003. She resisted those attempts, and Ginley allegedly sent the following email message to her:

---

[1] The court notes that the central issue in this motion for summary judgment concerns the validity of a release Meyers entered into. Thus, the alleged acts of harassment against Meyers set forth in this statement of facts are taken from her Complaint and are allegations which have not yet been challenged as a factual matter.

2

> I could tell that you were not very comfortable going out because I am your boss. There is nothing for you to be afraid of as long as you listen to me and not to the other employees at work. They don't know me at all so if there is anyone telling you anything at all do not listen to them. I am warning you don't listen to them otherwise you will have big problems.

(Compl. Ex. C.)

On May 1, 2003, Meyers told Schertz about Ginley's emails, groping, and other inappropriate touching. (Compl. ¶ 27.) She also requested relocation to the company's Cary Branch, which request was approved on May 2, 2003. Meyers then alleges that on May 2, Schertz coaxed her into his pick-up truck and attempted to force her to perform oral sex on him. (Compl. ¶ 29.) Meyers was able to resist and exited the vehicle. (*Id.*)

Meyers alleges that Schertz then sent the following May 2 email to her:

> Thanks, for the great afternoon. I know you didn't want to do the things I asked you to. Maybe it is best that we are friends for now, as I could tell you didn't feel comfortable doing the sexual things. Don't tell anyone about any of this Ok. What happened needs to remain strictly confidential Ok? If anyone finds out about this there can be a lot of problems for me and I know you don't want that. Maybe we can do this again real soon.

(Compl. Ex. K.) On May 13, 2003, Meyers allegedly received the following email from Ginley:

> Blew off your meeting again tonight! Remember I know where you are, whom you are with, and what time you are there at all times!

(Compl. Ex. N.) After telling a co-worker about what Ginley and Schertz had been doing to her, Meyers allegedly received another email from Ginley on May 18, 2003:

> Why did Kelly tell Karl and I you are about to go to Bob Phillips, and corporate on us? You better not go and talk to anyone about anything or you are dead!!!!!!!!!!

(Compl. Ex. O.)

3

On May 19, 2003, Meyers reported to Phillips, the human resource manager, that she had copies of threatening and offensive emails from Ginley and Schertz. (Pl. Aff. ¶ 4.) Meyers also said that she wanted to talk to a lawyer, but Phillips appeared to be angry and said that "a lot of people could get hurt." (*Id.*) On the next day Meyers met with Phillips again. He told Meyers that she should not pursue this with a lawyer because Ginley and Schertz would lose their careers. (Pl. Aff. ¶ 5.) Meyers became very upset and confused, and she went to see a psychiatric counselor upon Phillips' recommendation on May 22, 2003. (Pl. Aff. ¶ 7.) On the same day, Phillips met with Meyers again and gave her two release forms to take home and think about overnight. (*Id.*) Meyers was extremely frightened and intimidated by Ginley and Schertz and all she could think about were their threatening emails. (Pl. Aff. ¶ 8.) On May 23, 2003, Meyers returned to Phillips' office and signed a release that allowed her to keep her job. It provided in part:

> In exchange for the payment described in Paragraph 2, you are agreeing not to sue TruGreen and you are waiving and releasing all claims and causes of action arising out of your employment with TruGreen that you may have against TruGreen on the day you sign the Agreement. This includes, but is not limited to, claims for breach of implied or express employment contracts; claims under federal, state and local laws, including Title VII of the Civil Rights Act of 1964; Section 1981 of the Civil Rights Act of 1866; and the Age Discrimination in Employment Act; claims for violation of public policy or common law (including claims for defamation, infliction of emotional distress, negligence and invasion of privacy).

(Def. L.R. 56.1 ¶¶ 6, 9.)

In exchange for the release of all claims, TruGreen agreed to pay Meyers the sum of $3,000, less applicable federal and state payroll deductions. (Def. L.R. 56.1 ¶ 7.) After signing the release Meyers took a few days off and returned to work on May 27, 2003. (Pl. Aff. ¶ 8.)

She felt extremely emotional and upset and could not perform her work. (Pl. Aff. ¶ 10.) Meyers then called Phillips and told him about her situation. (Pl. Aff. ¶ 11.) Phillips suggested that she should release everyone and resign from the company with more money. (*Id.*) Phillips also said that if Meyers stayed on, she was going to be fired and would end up with no job and no money. (Pl. Aff. ¶ 12.)

On June 2, 2003, Phillips told Meyers that the company would give her $10,000 if she would sign another release and quit her job and that she needed to sign this release right away. (Pl. Aff. ¶ 13.) Meyers signed the release on the next day without talking to a lawyer. (Pl. Aff. ¶ 14.)[2] Afterwards Meyers continued to see a psychiatrist until her insurance ran out in approximately August or September of 2003. (Pl. Aff. ¶ 16.) After this case was filed, Ginley allegedly called Meyers and showed up in front of her house on several occasions trying to get her to drop this case. (Pl. Aff. ¶ 17.)

## DISCUSSION

Defendants move for summary judgment based on the June 3, 2003 release agreement between Meyers and the defendants. Meyers does not dispute that the agreement, if valid, would bar all of the claims she asserts in this action. Instead, she argues (1) that the release was not signed knowingly and voluntarily or (2) that she signed the release under duress.

A.  **Knowing and Voluntary**

A release is valid if it was executed in a knowing and voluntary manner. *Pierce v. Atchison, Topeka and Santa Fe Ry. Co.*, 65 F.3d 562, 570 (7th Cir. 1995) ("*Pierce I*"). The

---

[2]This June 3, 2003 release had substantially the same terms as the release Meyers previously entered into on May 23, 2003.

5

Seventh Circuit uses a "totality of the circumstances" test to assess whether a person knowingly and voluntarily signed a release. *Id.* at 571. Under the *Pierce I* test, the court analyzes the following factors: (1) the employee's education and business experience; (2) the employee's input in negotiating the terms of the settlement; (3) the clarity of the agreement; (4) the amount of time the employee had for deliberation before signing the release; (5) whether the employee actually read the release and considered its terms before signing it; (6) whether the employee was represented by counsel or consulted with an attorney; (7) whether the consideration given in exchange for the waiver exceeded the benefits to which the employee was already entitled by contract or law; and (8) whether the employee's release was induced by improper conduct on the defendants' part. *Id.*

Factors three, five and seven are undisputed and weigh in favor of Meyers knowingly and voluntarily waiving her rights in the release agreement. Both sides agree that the terms of the release are clear. Moreover, Meyers admits to reading the release and considering its terms before signing. And Meyers also concedes that the $10,000 she received in exchange for the second release exceeded any benefit to which she was otherwise entitled to by contract or law.

Factor six is also undisputed but weighs against a knowing and voluntary waiver. Meyers was not represented by counsel when she signed the release, nor did she consult with an attorney.

Each of the remaining factors is disputed in some degree. Concerning factor one, Meyers was approximately 24 years old, a high school graduate and possessed some business experience when she signed the release. However, since this factor considers whether an employee, based on their age, education and experience, was able to understand the terms of the release, the court also looks to Meyers' mental state. *E.g., Pierce* v. *Atchison Topeka and Santa Fe Ry. Co.*,

110 F.3d 431, 442 (7th Cir. 1997) ("*Pierce II*") (noting that inquiry looks "at bottom . . . into the mental state of the party who is purported to have waived those rights."). Meyers has presented evidence suggesting that, because of the harassment which allegedly took place, she was in a "confused and upset" psychological state while dealing with each of the releases she signed.

For example, on May 19, 2003, after informing Phillips of the alleged threatening emails and phone messages, Meyers states that she "broke down in tears and couldn't understand why [Phillips] would react the way he did." (Meyers Aff. ¶ 4.) On May 20, 2003, Meyers alleges that she informed Phillips that she "couldn't sign the [first] release then and that I wanted to talk to somebody about it first because I did not understand everything and was still very upset and confused by everything." (Meyers Aff. ¶ 5.) The next day, Meyers alleges that Phillips himself suggested that she see a therapist or counselor about her mental state. (Meyers Aff. ¶ 6.) On May 22, 2003, Meyers continues that she was "very much upset emotionally and confused over this whole matter." (Meyers Aff. ¶ 7.) She continues that after speaking with her parents, she still felt "extremely frightened and intimidated by [Ginley and Schertz]." (Meyer Aff. ¶ 8.)

On May 23, 2003, the date Meyers signed her first release, she stated that she was "so confused and upset that all I could think about was keeping my job." (Meyers Aff. ¶ 9.) After signing the release she states that she "became extremely emotional and upset and couldn't deal with anything because of what had been happening." (Meyers Aff. ¶ 10.) On May 30, 2003 Meyers states that, after she was told that she seemed out of it and was too upset to work, she "lost control and broke down." (Meyers Aff. ¶ 12.) She maintains that she called Phillips and stated that she "couldn't control my emotions anymore and that I shouldn't have signed the release because I did not know what I was doing." (*Id.*) On June 3, 2003, shortly before going to

7

sign the second release, Meyers states that she had "broken down in tears" and was "extremely upset about having to quit my job, and about what had happened to me." (Meyers Aff. ¶ 14.) Meyers further states that a week afterward, her psychiatrist said that she should be hospitalized because of the emotional condition she was in. (Meyers Aff. ¶ 15.) All of this is probative in determining whether Meyers knowingly and voluntary signed the June 3 release and, viewing these facts in a light most favorable to Meyers, they suggest that she did not knowingly and voluntary enter into the release.

Defendants, in response, characterize the evidence in Meyers' affidavit as "self-serving." The Seventh Circuit, however, in *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003), made clear that "[p]rovided that the evidence meets the usual requirements for evidence presented on summary judgment–including the requirements that it be based on personal knowledge and it set forth specific facts showing that there is a genuine issue for trial–a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts." There can be no question here that Meyers' affidavit is based on her personal knowledge and it does sufficiently set forth specific facts. Therefore, this court may properly consider it as probative evidence weighing against the conclusion that her release was signed knowingly and voluntarily.

Moving on to factor two, the parties dispute the input Meyers had in negotiating the release. Defendants argue that, after Meyers read the release, it was revised to address a concern Meyers raised concerning the agreement's COBRA provision. (Def. L.R. 56.1 ¶ 13.) Meyers characterizes this exchange as something less than input into the agreement and more along the lines of her inquiring as to whether her therapy was covered under COBRA and, if so, for how long. (Pl. Resp. to Def. L.R. 56.1 ¶ 13.) Meyers cites paragraph 17 of her affidavit in response

8

to defendants' argument, but paragraph 17 adds nothing to this analysis and does not even mention Meyers' addressing a concern with her therapy and whether it would be covered under COBRA. The court, therefore, accepts that Meyers had some level of input into the negotiation of the contract, although this appears to be minimal and weighs in defendants' favor on this motion only slightly.

Element four, which concerns the amount of time the employee had for deliberation of the release, presents somewhat of a mixed bag. Defendants argue that Meyers was familiar with the second release because the first release she signed was identical and given to her nearly ten days before she signed the second release. Moreover, defendants argue that it was Meyers who contacted Phillips about a second release agreement nearly one week after signing the first release. Defendants also note that Meyers signed the second release on June 3, 2003, three days after the discussion of a second release had begun. Meyers, in response, argues that she was only given overnight to decide whether to accept the June 3, 2003 release. If Meyers means to suggest that she did not have time to deliberate on the terms of the June 3, 2003 release, her argument is weakened by defendants' argument above that the two releases she signed were identical and ten days had passed since she was confronted with the first release.

The first release, however, differed from the second insofar as Meyers was agreeing to leave her job when she signed the second release. Viewing the evidence in a light most favorable to Meyers, she had approximately three days to deliberate on the decision as to whether to accept the second release and forego her employment. The court cannot say as a matter of law that this is an ample amount of time, particularly where, as here, there was pressure for the release to be signed "right away." *E.g., Pierce II*, 110 F.3d at 440 (noting that "inordinate pressure" could be

9

found where plaintiff had only one business day to weigh his options); *cf., Cirillo v. Arco Chemical Co.*, 862 F.2d 448, 453 (3d Cir. 1988) ("The terminated employees . . . were told that they could not sign the Release for at least five days and the record discloses that Cirillo took considerably longer to reflect upon the matter.").[3]

Finally, the parties disagree on the ninth factor, whether the employee's release was induced by improper conduct on the defendants' part. This factor looks to whether defendants engaged in improper conduct designed to induce Meyers to sign the June 3, 2003 release agreement rather than the underlying acts which caused the agreement to be formulated in the first place. Other than the pressure defendants allegedly placed on Meyers, already discussed, there is no evidence in the record supporting improper conduct on the part of defendants to induce Meyers to sign the release.

Weighing all of the above factors, the court simply cannot say as a matter of law that Meyers knowingly and voluntarily entered into the release agreement. Much of this analysis would focus on the credibility of the witnesses, particularly that of Meyers. This court does not, and cannot, make such credibility determinations on a motion for summary judgment. *See Payne*, 337 F.3d at 771-72. As such, defendants' motion for summary judgment is denied on this ground.

**B.  Duress**

Meyers also appears to raise the issue of duress in regard to her signing of the June 3, 2003 release. Duress is a defense to an otherwise valid contract. *Pierce I*, 65 F.3d at 569. It is

---

[3]Indeed, at least with respect to age discrimination claims, the Older Workers Benefit Protection Act, 29 U.S.C. § 626(f)(1), provides that the minimum elements for a knowing and voluntary waiver include that "the individual is given a period of at least 21 days within which to consult the agreement."

10

characterized as "the taking of undue advantage of the business or financial stress or extreme necessities or weaknesses of another," as opposed to placing another in "a difficult bargaining position or the pressure of financial circumstances." *Id.*

In *Laemmar v. J. Walter Thompson Co.*, 435 F.2d 680 (7th Cir. 1970), the Seventh Circuit stated that "the threat of discharge from one's employment may constitute duress which would make voidable a contract executed while a party was under such a threat." *Id.* at 682; *see also, Oglesby v. Coca-Cola Bottling Co. of Chicago/Wisconsin*, 620 F. Supp. 1336, 1343 (N.D. Ill. 1985) (duress could be found by rational trier of fact where plaintiff was presented with release and informed that "he would be terminated and he had the option to determine which route he wanted to take."). In this case, among other allegations, Meyers avers that prior to signing the release, under which she would have resigned her employment with TruGreen, Phillips told her that "if [she] stayed on, [she] was going to be fired and that [she] would end up with no job and no money." (Meyers Aff. ¶ 12.) Phillips denies ever saying this, noting that "[a]t no time did I inform Ms. Meyers that she had to resign or she would be terminated." (Phillips Aff. ¶ 6.) Once again, the court is in no position to decide this disputed issue of fact. If Meyers' version is true, a reasonable jury could find duress insofar as she was under the threat of discharge if she did not sign the release. Defendants' motion for summary judgment is, therefore, denied on this ground also.[4]

---

[4] Defendants also argue in their reply brief that Myers did not tender back the $10,000 she received as consideration for the June 3, 2003 agreement, and by keeping the benefits, she actually ratified the agreement. The court, however, will not consider this argument for two reasons. First, neither party's evidence proves whether Meyers tendered back or attempted to tender back the $10,000, so the court disregards this fact as unsupported by the record. Second, defendants raised the argument for the first time in their reply. An argument introduced for the first time in a reply brief is waived. *Fenster v. Tepfer & Spitz, Ltd.* 301 F.3d 851, 859 (7th Cir. 2002).

11

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is denied [#8].

This case will be called for a status conference on June 17, 2004 at 9:30 a.m.

ENTER: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: May 21, 2004